THE NATIONAL BANK OF NEW JERSEY, A CORPORATION ORGANIZED UNDER THE BANKING LAWS OF THE UNITED STATES, PLAINTIFF-APPELLANT, v. DIVISION OF TAX APPEALS IN THE STATE DEPARTMENT OF TAXATION AND FINANCE, MIDDLESEX COUNTY BOARD OF TAXATION, A MUNICIPAL CORPORATION OF NEW JERSEY, AND CITY OF NEW BRUNSWICK, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued June 6, 1949—Decided June 30, 1949.

Mr. *Irving Riker* (Mr. *Clark Crane Vogel,* on the brief; *Messrs. Riker, Emery & Danzig,* attorneys) argued the cause for the plaintiff-appellant.

*Mr. John T. Keefe* (*Mr. Paul W. Ewing,* attorney for the respondent City of New Brunswick; *Mr. Edmund A. Hayes,* attorney for the respondent Middlesex County) argued the cause for the defendants-respondents.

The opinion of the court was delivered by

CASE, J. The primary question is the interpretation to be given *R. S.* 54:9–4 as amended by *chapter* 69, *P. L.* 1940. The secondary question is whether an appeal lies.

The controversy is about the valuation placed upon the common stock of the National Bank of New Jersey by the Middlesex County Board of Taxation for the purpose of assessing those shares for taxation and arises out of the fact that the retirable value of the preferred stock of the bank is double the par value of that stock. In arriving at the value of the common stock it was necessary, as will presently be more explicitly stated, to deduct from the assets of the bank the value of the preferred stock. The assessing authorities made the deduction by using the par value of the preferred stock, a method of calculation which was approved in the judgment under appeal. It is the contention of the appellant that the deduction should have been at the retirable value.

Pertinent portions of the controlling statute follows:

"54:9–2. The shares of the common capital stock  *  *  *  shall be assessed and taxed according to their true value, to be determined in accordance with the provisions of *sections* 54:9–4 and 54:9–9 of this title.  *  *  *

"54:9–4. The value of each share of common stock of each bank shall be ascertained and determined by adding the amount of its capital, surplus and undivided profits and deducting therefrom the assessed value of its real property, including in such deduction the assessed value of all real property owned by a corporation all the stock of which corporation is owned by such bank, and also deducting therefrom an amount equal to the aggregate par or retireable value of all classes of the issued and outstanding preferred stock of such bank, and by dividing the result by the number of its shares of common stock outstanding, it being the intention that the shares of preferred stock and the capital represented thereby shall not be assessed or taxed; nor shall there be assessed or taxed any stock issued to former unpaid depositors of the bank while held to evidence their right to repayment under any plan of reopening or rehabitation approved by the Commissioner of Banking and Insurance. No deduc-

tion or exemption shall be allowed or made from the value determined as provided in this section.

"54:9-9. Each county board of taxation shall * * * ascertain * * * .

*       *       *       *       *       *       *       * .

"(h) The true value of a single common share of each (bank), determined in accordance with the provisions of *section* 54:9-4 of this title; and

"(i) The amount of tax levied upon the common capital stock of each at the uniform rate."

There were two classes of preferred stock, "A" and "B," issued under agreement with the Reconstruction Finance Corporation following the national bank holiday of 1933. The Reconstruction Finance Corporation subscribed for the issue of preferred stock "A" consisting of 500,000 shares with an original par value, which was also its retirable value, of $15 each, amounting to a total of $750,000. Others, presumably directors of the bank, subscribed for 10,000 shares of preferred stock "B," each share having an original par value, which was also its retirable value, of $50, amounting to a total of $500,000. Thus, on the completion of those steps, preferred Class "A" stock had a par *and* retirable value of $15, and Class "B" preferred stock had a par *and* retirable value of $50; and all of that stock represented money actually paid to the bank in the same amount as consideration for the issue. In 1937, the Comptroller of the Currency suggested that the bank charge off its books certain assets which had resulted in losses. Thereupon, with the consent of Reconstruction Finance Corporation, the Articles of Association of the bank were amended so that the par value of preferred stock "A" was reduced from $15 a share to $7.50 a share and the par value of preferred stock "B" from $50 a share to $25 a share, but the retirable value of both classes of preferred stock was retained as theretofore, not only as the amount to be paid on the call of the stock for retirement but also as a priority over the common stock in the event of liquidation, dissolution or winding up. The reduction of the par value of the stock did not alter the fact that twice the new par value had been paid in actual money to the bank for the stock and that the holders of the preferred stock retained their priority in the

capital moneys of the bank, in the full amount of the sum paid, over the holders of the common stock. *Inter sese,* prior rights were lodged with those who, in the bank crisis, came in with fresh capital; in this instance, the holders of preferred stock. They were, and are, entitled to the first cut from the loaf; and since there is but one loaf, it stands to reason that what the common stockholders are entitled to receive from the capital assets is reduced by that much. The banking authorities considered it essential to sound banking practice that a changed front should be presented to bank customers, but at the same time that the equities as between the classes of those who were the bank owners should be preserved. It is to be remembered that the disputed assessment is upon the common stock, not upon the bank and specifically not upon the preferred stock or the capital represented thereby. This is so notwithstanding the bank may, *R. S.* 54:9–14, and did in this case, request that the assessment be made to and in the name of the bank instead of to and in the names of the individual shareholders. The obligation upon the bank is optional with the bank; failing that optional assumption, the assessment is against the individual shares and is a lien thereon.

Thus the aggregate retirable value of both classes of the preferred stock became equal to double the par value thereof. Thereafter there were reductions in the outstanding stock of both classes to the extent that on December 31, 1945, the aggregate par value of outstanding class "A" stock amount to $150,000 and of class "B" stock amounted to $168,750, accomplished by retiring certain blocks of the preferred stock on payment of its retirable value, that is, double its par value. On January 4, 1946, the appellant bank, in compliance with *R. S.* 54:9–5, filed with the Middlesex County Board of Taxation its annual statement disclosing the bank's capital structure. The Board of Taxation calculated from the figures shown thereon that the value of the common stock was $689,705.14. The appellant bank contends that the last named figure should have been $370,955.14. The difference is due to the varying methods of computation already explained.

The source of *R. S.* 54:9–2 *et seq.*, was *chapter* 265, *P. L.* 1918. *Section* 2 of the last named statute when passed in 1918 and for many years thereafter provided that the value of each share of stock should be ascertained by adding together the amount of the capital surplus and undivided profits and deducting therefrom the assessed value of the real property and dividing the result by the number of outstanding shares. The capital stock of banks then consisted of common shares only. After the banking troubles of 1933 and certain amendments to the National Banking Act (*e. g.*, 12 *U. S. C. A.*, § 51d) authorizing the issue of preferred stock our legislature passed an amendatory act, *chapter* 2, *P. L.* 1934, which recognized the existence of preferred stock and provided that the value of each share of common stock should be ascertained and determined by adding together the amount of the capital, surplus and undivided profits and deducting therefrom the assessed value of the real property *and an amount equal to the aggregate par value of all classes of its issued and outstanding preferred stock* and dividing the result by the number of outstanding shares of common stock, "it being the intention that the shares of preferred stock * * * and the capital represented by such shares shall not be assessed or taxed." The act was again amended by *chapter* 210, *P. L.* 1935, which did not essentially change any of the factors now in question. Then came the Revision of 1937 which set up this matter as *section* 4, namely, *R. S.* 54:9–4, and provided that the value of each share of common stock should be ascertained by adding the amount of capital, surplus and undivided profits and deducting therefrom the assessed value of the real property, deducting an amount equal to the aggregate par value of all classes of the issued and outstanding preferred stock and dividing the result by the number of shares of common stock, "it being the intention that the shares of preferred stock and the capital represented thereby shall not be assessed or taxed."

■ ■ Following upon that came the Supreme Court decision in *Clinton Trust Co. v. State Board of Tax Appeals*, 124 *N. J. L.* 245 (1940), affirmed by the Court of Errors and

Appeals on the opinion below, 125 *N. J. L.* 275. In that case
the Clinton Trust Company had adopted a plan whereby the
creditors took a part of their claims in preferred stock and
because the securities represented by that stock were con-
sidered to be worthless the stock was made redeemable at
double its par value. The taxing authorities in arriving at
the assessment of the common stock refused to deduct more
than the par value of the preferred stock, that is, they refused
to deduct the double amount which would need to be paid if
the preferred stock were called for redemption. Upon the
reasoning that there was no requirement in the terms of re-
organization that the preferred stock should ever be redeemed
or that a reserve should be set up for the purpose of redemp-
tion and that there was nothing to show that on a liquidation
of the bank the preferred stock would be entitled to its re-
demptive as against its par value—these and the other cir-
cumstances mentioned in the opinion—the action of the tax
boards was sustained. That decision was rendered in the
Supreme Court on February 29, 1940. On May 13, 1940,
the Legislature, by *chapter* 69, *P. L.* 1940, changed the lan-
guage which had theretofore read "deducting therefrom an
amount equal to the aggregate par value of all classes of the
issued and outstanding preferred stock" so that the same was
made to read "deducting therefrom an amount equal to the
aggregate par or retirable value of all classes of the issued and
outstanding preferred stock." So we now have the situation
that not only is there the expressed statutory intention as
there was then that the shares of the preferred stock and the
capital represented thereby shall not be assessed or taxed but
the added provision, obviously inserted because of that de-
cision, as to retirable value. From the content of the earlier
and the later statute and the timing of the amendment with
relation to the court decision we conclude that the Legislature
meant, by the change, to give a surer approach to the intrinsic
value of the common stock and to cause the assessing body to
use whichever preferred stock value would more accurately
measure the common stock value. "Capital" is used in the
statutes and the cases with different meanings, depending

upon its connections. *Commissioner v. Filoon,* 310 *Mass.* 374, 38 *N. E.* 2d 693 (*Sup. Jud. Ct. Mass.,* 1941); *Flint v. Commissioner,* 312 *Mass.* 204, 43 *N. E.* 2d 789 (*Sup. Jud. Ct. Mass.,* 1942). We interpret the words as used in the phrase "the shares of preferred stock and the capital represented thereby shall not be assessed or taxed" to refer to the money contributed by the purchasers of preferred shares and reflected in the bank's capital structure. *Cf. Wetherbee v. Baker,* 35 *N. J. Eq.* 501 (*E. & A.* 1882). And we understand the language of the direction to mean what it clearly says, namely, that neither the preferred stock nor the capital represented thereby shall be assessed or taxed in that taxing procedure. *Clinton Trust Co. v. State Board, supra. Second National Bank, etc., v. State Board,* 114 *N. J. L.* 573 (*Sup. Ct.* 1935), is not a holding on the present issue.

Inasmuch as the statutory changes reiterated that the assessment should be at the value of the common stock and not at all upon the preferred stock or the capital represented thereby, this view has the virtue of reality; because it can hardly be denied that the present value of the common stock, however that value be defined or ascertained, must reflect the prior obligation of the bank assets to pay off the preferred stock at double its par value if and to the extent that the preferred stock be called, and the further obligation, in the event of liquidation, to pay double the par value on the preferred stock prior to any payment on the common. Respondents' contention that the relative rights of the preferred and common stockholders do not affect the true value of the. common stock is untenable as is also their further argument, in so far as concerns the valuing of the common shares, that the deduction of the preferred stock obligation in calculating the value of the common stock is violative of the requirement of *article* 4, *section* 7, *paragraph* 12 of the former constitution that property shall be assessed for taxes under general laws, and by uniform rules, according to true value. We think that the authority of the bank under its amended articles to retire preferred stock by purchase under certain conditions for less than either par or double par on the offer of a holder does not,

until such a purchase is made and the stock ceases to be a factor in the tax calculation, affect the situation. No such purchases have been made, and none appear to be anticipated.

Respondents contend that the disputed deduction is permissible only when the bank maintains a mandatory and inviolate scheme for redemption and cite the *Clinton Trust Co. case, supra,* in support. The statute does not so require, and the decision does not so hold. Sufficient has been already said to distinguish the cited case. In the instant case the priority of the double par valuation over any claim by the common stock on dissolution or winding up is established; the subordination of the common stock is clear; a mandatory reserve for redemption at double par was set up, rather complicated but nevertheless effective and with the result that substantial blocks of preferred stock have been retired on payment of double the par value; and, of primary importance in an effort to ascertain the legislative intent, a statute was passed immediately after the decision in the *Clinton. Trust Co. case* giving unmistakable emphasis to the deduction of the aggregate retirable value from the assets as a factor in ascertaining the value of common stock on a weighing of resources and priorities.

It is argued by respondents that the deduction for tax purposes of the item now in controversy would carry over into the bank's capital structure in such a way as to impute insolvency under federal banking laws and practices. We are not impressed by that contention; but, whatever its strength or weakness, it does not control the present issue. We are concerned with a statutory formula for aiding in the determination of the value of common bank stock with which, as the appellant contends, and as we for the reasons stated above find, the tax boards did not comply.

When the constitutional changes in our court system became effective on September 15, 1948, the status of this case was that until then the actions of the Middlesex County Board of Taxation and of the State Division of Tax Appeals were before the former Supreme Court on writ of *certiorari,* and concurrently with the change the record was transferred

to the Appellate Division of the Superior Court whose disposition of the cause is the subject of this appeal. It is the contention of respondents that an appeal does not lie with respect to matters so situated. We have decided *contra* that contention in *Giordano v. City Commission of the City of Newark,* 2 *N. J.* 585.

The judgment of the Appellate Division is reversed. The record will be remanded for further action in accordance with this opinion.

*For reversal*—Justices CASE, HEHER, OLIPHANT, BURLING and ACKERSON—5.

*For affirmance*—None.